## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| HUB INTERNATIONAL MIDWEST LIMITED, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 22 C 1270 |
| v. | ) ) | Judge Joan H. Lefkow |
| AEU BENEFITS, LLC, et al. | ) ) | |
| Defendants. | ) | |

## OPINION AND ORDER

In this case, Plaintiff HUB International Midwest Limited (HUB), an insurance agency, files suit against various people and entities associated with AEU Benefits, LLC and involved in the operation of an employee medical benefits plan ("the AEU Plan").[1] (Dkt. 27.) HUB provided "certain limited customer service bridge type services" to employers who had employees with unpaid medical claims under the AEU Plan. (Dkt. 27 ¶ 36.) After the AEU Plan proved insolvent and unable to pay millions of dollars of alleged outstanding medical claims, the United States Department of Labor sued, and the AEU Plan was placed into receivership. (*See* dkts. 27-1, 27-2, 27-3, 27-4.) HUB faces approximately $4 million in damages asserted against it in the underlying receivership action, as well as damages resulting from loss of business and reputational harm. (Dkt. 27 ¶¶ 55, 57.) In this lawsuit, HUB alleges that it incurred these damages because of misrepresentations made to it by defendants. Before the court is a motion to dismiss brought by two of those defendants—Thomas Stoughton and SD Trust Advisors, LLC

---

[1] This court has subject matter jurisdiction under 28 U.S.C. § 1332 (*see* dkt. 28; dkt. 27 ¶¶ 14, 15, 17, 19, 24, 27, 29 (properly describing citizenship of individual and LLC defendants)), and venue is proper under 28 U.S.C. § 1391(b).

(collectively, the SD Defendants)—who contend that this court lacks personal jurisdiction over them and that HUB has failed to state a claim against them. For the reasons described below, the SD Defendants' motion is denied.

## BACKGROUND

HUB alleges the following facts in its First Amended Complaint. At all relevant times Defendant Stephen Satler was Chief Executive Officer and an owner of defendant AEU Holdings, LLC and was President and on the Board of Managers of defendant AEU Benefits, LLC (collectively, the AEU Defendants). (Dkt. 27 ¶¶ 15–23.) The AEU Defendants managed and operated the AEU Plan along with Defendant Rodney Maynor (who is the sole owner, President, and Chief Executive Officer of non-party entities Black Wolf Consulting, Inc. and R. Maynor & Associates, Inc.). (*Id.* ¶¶ 15–23, 29–30.) SD Trust is a limited liability company owned and operated in part by Stoughton, a Georgia resident. (Dkt. 27 ¶¶ 24, 27–28.) From December 12, 2016 until November 3, 2017, SD Trust's sole client was the AEU Plan. (*Id.* ¶ 25.) During this period, "SD Trust provided services to the Employer Groups covered by the AEU Plan, and to the AEU Plan, itself, by holding the assets of the Employer Groups in SD Trust's name at Iberia Bank, and paying money out of these accounts to other service providers at the AEU Defendants' direction." (*Id.* ¶ 26.)

On March 9, 2017, HUB held a meeting at its Chicago, Illinois offices "regarding the status of the numerous unpaid medical benefits claims" under the AEU Plan. (*Id.* ¶¶ 31–33.) Satler attended this meeting as a representative of the AEU Defendants. (*Id.* ¶ 34.) Stoughton attended on behalf of SD Trust. (*Id.*) At the time of this meeting, "HUB was providing certain limited customer service bridge type services to employers of the employees, including, but not limited to, those employees whose unpaid medical claims were under discussion" (*id.* ¶ 35), and

therefore "HUB had a legitimate interest in being correctly informed as to servicing issues and whether and when unpaid medical claims would be paid, and whether and when future medical benefits claims would be paid for [enrolled] employees" (*id.* ¶ 37). HUB provided these services at Maynor's request, and all defendants were aware that HUB was providing such services. (*Id.* ¶¶ 35–36.)

At the March 9, 2017 meeting, Satler and Stoughton made representations that the AEU Plan "was on track to and would, in fact, fund, process, and pay all of the outstanding unpaid medical benefits claims, as well as future claims, concerning plan participants and their beneficiaries in connection with employer groups associated with HUB." (*Id.* ¶ 38.) These defendants also made a "specific representation" as to their "near term timetable for promptly funding and paying all outstanding unpaid medical benefits claims" (*id.*): "unpaid claims would be funded based on a schedule with the $140,000 in smaller claims funded 'now' and $171,000 funded by March 17, 2017 with the remainder of the unpaid claims to be paid by [the AEU Plan] shortly thereafter" (*id.* ¶ 42). Satler and Stoughton further informed HUB that the AEU Plan "was and would remain financially sound and would timely pay medical benefits claims" (*id.* ¶ 39), and they "explicitly encouraged and requested HUB to keep employer groups and their associated employees/plan participants and their beneficiaries enrolled in [the AEU Plan]." (*Id.* ¶ 40.) Satler and Stoughton also "impliedly and explicitly encouraged and requested HUB … to also refer additional employer groups to the medical benefits plan based upon the represented financial strength and soundness of [the AEU Plan] … and its represented ability to timely fund and pay benefits claims then, and into the future." (*Id.* ¶ 41.) Finally, Satler and Stoughton told the HUB representatives "that there was in place an excess policy at an attachment point of $125,000 through Lloyd's of London that would cover claims exposures." (*Id.* ¶ 43.)

Despite these representations, a March 2017 memorandum circulated among the AEU Defendants "acknowledged that the AEU Plan [was] materially underfunded with approximately 21,000 unpaid claims." (*Id.* ¶ 46.) Similarly, a written communication in April 2017 from Maynor to Stoughton regarded "unpaid claims and complaints from [plan] participants." (*Id.* ¶ 47.) Furthermore, SD Trust had been aware of the unpaid claims problem—and had been unable to forward the full amount of requested funds to claims administrators—since at least February 13, 2017. (Dkt. 27-1 ¶ 128). Contrary to the representations Satler and Stoughton made at the March 9, 2017 meeting, the AEU Plan failed to timely fund and pay all of the unpaid medical benefit claims. (Dkt. 27 ¶ 51.) As a result of this insolvency, HUB incurred significant damages—including potential legal liability, legal fees, loss of business, and reputational harm. (*Id.* ¶¶ 55–57.)

Neither the AEU Defendants nor the SD Defendants ever disclosed the AEU Plan's inability to pay claims to HUB, the employer groups for which HUB was providing customer service bridge services, or AEU Plan participants and beneficiaries. (*Id.* ¶¶ 48–50.) HUB alleges that Satler and Stoughton either knew or should have known that the representations they made as to the AEU Plan's solvency at the March 9, 2017 meeting were false (*id.* ¶ 52), and that it could have taken action to avert the damages it incurred had Satler and Stoughton provided "true and accurate information" (*id.* ¶ 58).

Based on these facts, HUB filed suit in the Northern District of Illinois. In its Second Amended Complaint (dkt. 27), HUB brings claims for negligent misrepresentation (Count I) and fraudulent misrepresentation (Count II) against the SD Defendants. The SD Defendants now move to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and for failure to state a claim on all counts under Rule 12(b)(6). (Dkt. 29.)

## DEFENDANTS' 12(b)(2) MOTION TO DISMISS

The SD Defendants argue in their Rule 12(b)(2) motion to dismiss that the court lacks specific personal jurisdiction over them and that, even if the court finds jurisdiction proper, the court should decline to exercise such jurisdiction over Stoughton due to the fiduciary shield doctrine. These arguments are unavailing, and the court concludes that it has personal jurisdiction over both SD Defendants.

### A.     Legal Standard

A motion to dismiss under Rule 12(b)(2) challenges the ability of the court to exercise personal jurisdiction over the defendants. Fed. R. Civ. P. 12(b)(2). After a defendant makes a Rule 12(b)(2) motion, the plaintiff bears the burden of establishing personal jurisdiction. *Rogers* v. *City of Hobart*, 996 F.3d 812, 818 (7th Cir. 2021). If, as here, the court rules on the motion to dismiss without holding an evidentiary hearing, "the plaintiff bears only the burden of making a prima facie case for personal jurisdiction." *Curry* v. *Revolution Labs., LLC*, 949 F.3d 385, 392–93 (7th Cir. 2020). In evaluating whether the plaintiff has met its burden, "[t]he court will take the plaintiff's asserted facts as true and resolve any factual disputes in its favor." *Id.* at 392 (internal quotation marks omitted). But unlike a Rule 12(b)(6) motion, the court is not limited to considering the facts alleged in the complaint and may consider affidavits submitted by the parties. *See NBA Properties, Inc.* v. *HANWJH*, 46 F.4th 614, 620 (7th Cir. 2022). When the parties submit affidavits, "both parties' affidavits are accepted as true, and where they conflict, the plaintiff is entitled to resolution in its favor." *Id.*

### B.     Specific Jurisdiction

The SD Defendants argue that the court lacks personal jurisdiction over them. In a diversity case with claims based in Illinois common law, "a federal court sitting in Illinois may

exercise jurisdiction over the defendants … only if authorized both by Illinois law and by the United States Constitution." *Matlin* v. *Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019) (cleaned up). But "[b]ecause the Illinois long-arm statute extends as far as the Constitution permits, [courts] need only look to whether exercising personal jurisdiction … would comport with federal due process." *Rogers*, 996 F.3d at 818 (citing 735 Ill. Comp. Stat. 5/2-209(c)). Under the Due Process Clause of the Fourteenth Amendment, "a tribunal's authority depends on the defendant's having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co.* v. *Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (quoting *Int'l Shoe Co.* v. *Washington*, 326 U.S. 310, 316–17 (1945)). In other words, the necessary "minimum contacts" with the forum state exist if "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S. 286, 297 (1980). Personal jurisdiction may be "general" or "specific," *see Ford*, 141 S. Ct. at 1024, but only the latter is at issue in this case.

Three requirements must be met for a court to exercise specific personal jurisdiction over a defendant. First, the defendant "must take some act by which it purposefully avails itself of the privilege of conducting activities within the forum State." *Id.* (cleaned up). "The contacts must be the defendant's own choice and not random, isolated, or fortuitous," and "[t]hey must show that the defendant deliberately reached out beyond its home—by for example, exploiting a market in the forum State or entering a contractual relationship centered there." *Id.* at 1025 (cleaned up). Second, the plaintiff's claims "must arise out of or relate to the defendant's contacts with the forum." *Id.* (internal quotation marks omitted). Third, "any exercise of personal

jurisdiction must comport with traditional notions of fair play and substantial justice." *Curry* v. *Revolution Labs., LLC*, 949 F.3d 385, 398 (7th Cir. 2020).

Here, the SD Defendants contend that they lack the minimum contacts with Illinois necessary to establish specific jurisdiction, arguing that (1) "there are no allegations whatsoever against Mr. Stoughton or SD in the Complaint that allege Mr. Stoughton maintained any business operations or presence in Illinois" (dkt. 29 at 5); (2) the March 9, 2017 meeting in Illinois attended by Stoughton in his capacity as an officer of SD Trust is insufficient to establish personal jurisdiction even though HUB alleges that an intentional tort took place at that meeting; and (3) "HUB fails to allege any facts that show Mr. Stoughton or SD possessed any intent to affect an Illinois interest" (*id.* at 6). In support of these arguments, the SD Defendants attached a declaration from Stoughton in which he denies having any personal connection to Illinois and asserts that neither he nor SD Trust have ever owned bank accounts or other financial assets within Illinois, "conduct[ed] business within the State of Illinois," or entered into any contracts in Illinois or with HUB. (*Id.* Ex. A.)

In response, HUB argues that three facts support finding that the SD Defendants had the necessary minimum contacts with Illinois to establish personal jurisdiction. First, as the custodial account manager for the AEU Plan, the SD Defendants had responsibility for holding assets and moving funds related to Illinois employers and residents involved in the Plan. Second, "Stoughton/[SD Trust] sent communications related to the AEU Plan and participating plans directly to and from persons in Illinois, including Rodney Maynor and Black Wolf Consulting." (Dkt. 36 at 7.) And third, the SD Defendants "entered the State of Illinois on March 9, 2017 for the purpose of conducting and continuing business in Illinois." (*Id.* at 8.)

For the reasons explained below, the court concludes HUB has met its burden of making a *prima facie* case for personal jurisdiction.

1.  *Purposeful Availment*

Even though Stoughton's affidavit denies that the SD Defendants conducted business or entered into contracts in the state of Illinois (dkt. 29, Ex. A ¶ 11), HUB alleges that the SD Defendants satisfy the purposeful availment requirement because they conducted a substantial amount of business with Illinois entities. The SD Defendants do not dispute that as "custodial account manager" for the AEU Plan, SD Trust "provided services to the employer groups in the AEU Plan by holding the assets of the participating plans" in custodial or escrow accounts and using such assets to pay claims administrators and other service providers when instructed. (Dkt. 36 at 2–3 (citing dkt. 23-2; dkt. 23-3 ¶¶ 19, 49); *see also* dkt. 33 at 3.) Many employer groups participating in the AEU Plan, including those with unpaid claims, had headquarters in Illinois. (Dkt. 23-1 ¶ 3.) These allegations indicate that the business of the SD Defendants generally included receiving money from Illinois companies and transferring that money to administrators for the payment of claims incurred by those companies' participating employees (at least some of whose claims the court can reasonably infer to have been made by plan participants residing in Illinois).

Furthermore, the record includes specific allegations describing the SD Defendants' communications and transactions with Illinois entities. Black Wolf Consulting, Inc., an Illinois corporation, collected contributions from participating employers before sending such contributions directly to SD Trust. (Dkt. 27-1 ¶¶ 25, 77–81, 92.) This business arrangement continued for about eleven months, from December 2016 to November 2017. (*Id.* ¶¶ 81, 91–92.) Stoughton—in addition to being a part owner and operator of SD Trust—received a written

communication from Black Wolf's owner, president, and CEO, then-Illinois resident Maynor,[2] "regarding unpaid claims and complaints from participants" in April 2017. (*Id.* ¶¶ 26, 92, 194.) And there is no doubt that Stoughton personally attended a meeting in Illinois in his capacity as "managing member" of SD Trust on March 9, 2017 (dkt. 29, Ex. A ¶ 14), at which the "unpaid claims of employer groups" were discussed (dkt. 23-1 ¶ 3).

These alleged facts demonstrate that the SD Defendants "purposefully avail[ed] [themselves] of the privilege of conducting activities within the forum State." *Ford*, 141 S. Ct. at 1024. The SD Defendants' months-long business relationship with Black Wolf and Maynor, in which Illinois corporation Black Wolf served as an intermediary between SD Trust and employer groups (including many Illinois companies) participating in the AEU Plan, demonstrates that the SD Defendants' contact with Illinois was purposeful and "not random, isolated, or fortuitous." *Id.* at 1025. This is sufficient to establish the necessary intentional connection with the forum state. *See Curry*, 949 F.3d at 398 ("Such 'purposeful direction' may be shown by evidence that the defendant's actions, even if initiated outside of the forum state, nevertheless were directed at the forum state."); *see also NBA Props., Inc.* v. *HANWJH*, 46 F.4th 614, 621–25 (7th Cir. 2022); *Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 476 (1985). Furthermore, Stoughton, on behalf of SD Trust, physically traveled to Illinois for a meeting with HUB representatives and Satler about unpaid claims under the AEU Plan. In other words, Stoughton traveled to Illinois for a purpose relating to SD Trust's ongoing business connections with the state. This physical presence "enhance[s]" the SD Defendants' affiliation with Illinois and "reinforce[s] the reasonable foreseeability of suit there." *Burger King*, 471 U.S. at 476; *accord Walden* v. *Fiore*,

---

[2] Maynor is also a defendant in this case, but Florida is now identified by HUB as his state of residence and citizenship.

571 U.S. 277, 285 (2014). The SD Defendants' many contacts with Illinois satisfy the purposeful availment element of specific personal jurisdiction.

2.      *Relationship of Plaintiff's Claims and Defendants' Forum Contacts*

Next, there is no doubt that HUB's claims "arise out of or relate to the defendant's contacts with the forum." *Ford*, 141 S. Ct. at 1025; *see also NBA Props.*, 46 F.4th at 625 ("[T]he defendant's minimum contacts with the forum state [must] be '*suit-related*.'") (emphasis in original) (citation omitted). The paradigmatic example cited by the Supreme Court as satisfying this requirement is "an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Ford*, 141 S. Ct. at 1025. Here, HUB alleges that Stoughton made the misrepresentations at issue in this case while physically in Illinois for the March 9, 2017 meeting. In other words, HUB alleges that Stoughton made misrepresentations relating to SD Trust's business connections with Illinois while physically present in Illinois for a meeting regarding the substance of those business connections. The second element of personal jurisdiction is satisfied. *See id.* at 1026–32.

3.      *Traditional Notions of Fair Play and Substantial Justice*

Finally, subjecting the SD Defendants to personal jurisdiction in Illinois would not offend traditional notions of fair play and substantial justice. In conducting such analysis, courts consider:

> The burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of the underlying dispute, and the shared interest of the several States in furthering fundamental substantive social policies.

*NBA Props.*, 46 F.4th at 627 (citation omitted). Although it places some burden on the SD Defendants to defend the action in this district, Illinois has a strong interest in adjudicating the dispute locally because the allegedly tortious conduct occurred in Illinois and harmed an Illinois

company. *See Ford*, 141 S. Ct. at 1030 (states have "significant interests" in "providing their residents with a convenient forum for redressing injuries inflicted by out-of-state actors"). Moreover, no other state has a stronger interest in this case. Thus, HUB's interest in obtaining convenient and effective relief favors litigating the case where the allegedly unlawful conduct occurred and the harm was suffered. Finally, allowing HUB to litigate its misrepresentation claims in a single action rather than in multiple lawsuits in different fora promotes the efficient resolution of this dispute. These factors weigh heavily in favor of this court's exercise of personal jurisdiction.

Because HUB has shown that all three requirements of specific personal jurisdiction for both Stoughton and SD Trust are satisfied, it has met its burden of establishing a *prima facie* case. The court concludes that it has personal jurisdiction over the SD Defendants.

## C.     Fiduciary Shield Doctrine

Stoughton also argues that the court should decline to exercise personal jurisdiction as to him individually pursuant to the Illinois fiduciary shield doctrine. This doctrine "denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal." *Mission Measurement Corp.* v. *Blackbaud, Inc.*, 287 F. Supp. 3d 691, 709 (N.D. Ill. 2017) (quoting *Rice* v. *Nova Biomed. Corp.*, 38 F.3d 909, 912 (7th Cir. 1994)). But the Illinois Appellate Court has held that "[t]he doctrine is inapplicable to proprietors, partners, or comanaging members of a limited liability corporation," *Khan* v. *Gramercy Advisors, LLC*, 61 N.E.3d 107, 124 (Ill. App. Ct. 2016), and Stoughton is the managing member of SD Trust, a limited liability company (dkt. 29, Ex. A ¶ 2). As such, the fiduciary shield doctrine is inapplicable in this case. The court has personal

jurisdiction over Stoughton and SD Trust, and the SD Defendants' Rule 12(b)(2) motion to dismiss is denied.

## DEFENDANTS' 12(b)(6) MOTION TO DISMISS

The court turns next to the SD Defendants' Rule 12(b)(6) motion to dismiss HUB's negligent misrepresentation and fraudulent misrepresentation claims. It concludes that HUB has adequately stated claims in both counts.

### A.    Legal Standard

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In ruling on 12(b)(6) motions, the court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences in the plaintiff's favor. *See Taha* v. *Int'l Bhd. of Teamsters, Local 781*, 947 F.3d 464, 469 (7th Cir. 2020).

In general, pleading only requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), meaning that the plaintiff must "give enough details about the subject-matter of the case to present a story that holds together." *United States ex rel. Presser* v. *Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016). A heightened pleading standard applies to claims alleging fraud; there, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy

Rule 9(b), a plaintiff "must describe the 'who, what, when, where, and how' of the fraud." *Presser*, 836 F.3d at 776. "This requirement includes the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Rocha* v. *Rudd*, 826 F.3d 905, 911 (7th Cir. 2016).

## B.  Negligent Misrepresentation

The SD Defendants begin by arguing that HUB's complaint fails to state a claim for negligent misrepresentation. This claim is governed by the ordinary Rule 8(a)(2) pleading standard rather than Rule 9(b)'s heightened standard. *See Sabrina Roppo* v. *Travelers Commercial Ins. Co.*, 869 F.3d 568, 591, 591 n.71 (7th Cir. 2017). Under Illinois law, the tort of negligent misrepresentation has six elements:

> (1) a false statement of material fact, (2) carelessness or negligence in ascertaining the truth of the statement by the party making it, (3) an intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, (5) damage to the other party resulting from such reliance, and (6) a duty on the party making the statement to communicate accurate information.

*Turubchuk* v. *S. Ill. Asphalt Co., Inc.*, 958 F.3d 541, 548 (7th Cir. 2020) (citing *First Midwest Bank, N.A.* v. *Stewart Title Guar. Co.*, 843 N.E.2d 327, 332 (Ill. 2006)). The SD Defendants argue that (1) HUB fails to adequately allege that the SD Defendants owed a duty to HUB to communicate accurate information, (2) HUB has not identified any specific false statements made by the SD Defendants but instead only makes conclusory allegations, and (3) HUB has not pleaded sufficient facts to show its "justifiable and reasonable reliance" on any false statement (dkt. 29 at 7–11).

## 1.  *Duty to Communicate Accurate Information*

The SD Defendants contend that they had no obligation to communicate accurate information to HUB. The Illinois Supreme Court "has recognized a duty to communicate

accurate information (1) 'to avoid negligently conveying false information that results in physical injury to a person or harm to property' and (2) 'to avoid negligently conveying false information where one is in the business of supplying information for the guidance of others in their business transactions.'" *Kupper* v. *Powers*, 71 N.E.3d 347, 357–58 (Ill. App. Ct. 2017) (quoting *Brogan* v. *Mitchell Int'l, Inc.*, 692 N.E.2d 276, 278 (Ill. 1998)); *see also First Midwest*, 843 N.E.2d at 332. A party is in the business of supplying information for the guidance of others when the information is "central to the transaction," but not when "the information supplied is merely ancillary" or when the information "relates to tangible or noninformational goods offered by the defendant." *Patterson* v. *Midland States Bank*, 2014 IL App (5th) 120140-U, 2014 WL 235482, at *4 (Ill. App. Ct. Jan. 21, 2014) (citing cases); *see also BCBSM, Inc.* v. *Walgreen Co.*, 512 F. Supp. 3d 837, 845 (N.D. Ill. 2021). Accordingly, "negligent misrepresentation actions are almost universally limited to situations involving a defendant who, in the course of his business or profession, supplies information for the guidance of others in their business relations with third parties." *Kupper*, 71 N.E.3d at 358 (citation omitted).

Here, Stoughton, on behalf of SD Trust and in the course of the SD Defendants' business as custodial account manager of the AEU Plan, attended a meeting with Satler and HUB to discuss the unpaid claims under the AEU Plan. (*See* dkt. 27 ¶¶ 31–37.) Although the parties did not transact for this exchange of information, HUB contends that the SD Defendants made the alleged misrepresentations "in order to influence the decisions of plan participants … to stay in the [AEU] plan, and to not leave the [AEU] plan." (*Id.* ¶ 68.) Considering that all of SD Trust's work related to and therefore depended on the AEU Plan (*see id.* ¶ 25; dkt. 27-1 ¶ 27),[3] the court

---

[3] Because Exhibit A to HUB's complaint (dkt. 27-1), a pleading in the underlying Department of Labor action, is attached to, referenced by, and explicitly incorporated into HUB's complaint (*see* dkt. 27 ¶ 16), the court treats it as part of the complaint. *See* Fed. R. Civ. P. 10(c); *Williamson* v. *Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

can reasonably infer that providing information to HUB was closely linked with the SD Defendants' overall business activities. And the SD Defendants concede that they had no other business relationship with HUB that would make the discussion of the unpaid claims ancillary to some other transaction. (Dkt. 33 at 8 ("[T]here is no privity of contract between HUB and [the SD Defendants] and no contractual relationship is even contended by HUB.").) As alleged in the complaint, the entire business relationship between the SD Defendants and HUB involved the SD Defendants' supplying information that would guide HUB in providing services to its third-party employer group clients covered by the AEU Plan. As a result, the SD Defendants had a duty under Illinois law to accurately communicate information to HUB. *See Kupper*, 71 N.E.3d at 358.

2.    *False Statements*

The SD Defendants challenge the adequacy of HUB's allegations that Stoughton made false statements. They argue that HUB "fails to identify any specific false statements made by [the SD Defendants]" and "merely uses labels and broad statements that [Stoughton] attended a meeting with a host of others who are alleged to have made general statements to the effect all existing and future claims for medical benefits would be paid and that the Plans were on track and would remain financially sound and operate appropriately." (Dkt. 29 at 9.)

This objection mischaracterizes HUB's allegations. HUB alleges that the March 9, 2017 meeting was not attended by a "host of others" but by at least three of its own representatives, plus Satler on behalf of the AEU Defendants and Stoughton on behalf of the SD Defendants. (Dkt. 27 ¶¶ 31, 34.) HUB then alleges that Stoughton and Satler made false statements and describes these statements with specificity: the AEU Plan was on track to fund and pay all unpaid claims and future claims; the AEU Plan would remain financially sound and timely pay

15

claims; because the AEU Plan would timely pay claims, HUB should keep employer groups and their employees enrolled in the AEU Plan and refer additional employer groups to the AEU Plan; a schedule was in place to pay the unpaid claims; and an excess policy through Lloyd's of London would cover claims exposures. (*Id.* ¶¶ 38–43, 64.) HUB further alleges that these representations were false because the AEU Plan was in fact insolvent. (*Id.* ¶¶ 46–51.) These are not conclusional statements but specific allegations regarding what Stoughton said at the March 9, 2017 meeting, and the level of detail provided easily satisfies the Rule 8(a)(2) pleading standard.

3.      *Justifiable Reliance*

        The SD Defendants also contend that HUB's allegation fails to demonstrate justifiable reliance. The SD Defendants argue that it was unreasonable for HUB to rely on Stoughton's alleged misrepresentations because HUB has not alleged any facts that the SD Defendants had knowledge of the health of the AEU Plans and because HUB itself was already aware that the AEU Plan faced substantial financial problems. Under Illinois law, "[t]he question of justifiable reliance considers what the plaintiffs knew and what they could have learned through the exercise of ordinary prudence," and this question must be "viewed in light of the surrounding circumstances." *Turubchuk*, 958 F.3d at 552. "[J]ustifiable reliance exists when it was reasonable for plaintiff to accept defendant's statements without an independent inquiry or investigation." *Wigod* v. *Wells Fargo Bank, N.A.*, 673 F.3d 547, 569 (7th Cir. 2012). Furthermore, "[a]lthough a person may not enter into a transaction with his eyes closed to available information, a plaintiff's failure to investigate the reliability of the defendant's representations is not fatal where such inquiries are inhibited by statements creating a false sense of security." *Abazari* v. *Rosalind*

*Franklin Univ. of Med. and Sci.*, 40 N.E.3d 264, 277 (Ill. App. Ct. 2015) (quotation marks omitted).

Here, the complaint makes clear that HUB knew that the AEU Plan had a problem with unpaid claims (dkt. 27 ¶ 32), that it called the March 9, 2017 meeting to better understand these issues (*id.*), and that at the meeting Satler and Stoughton provided repeated assurances of the AEU Plan's present and future solvency (*id.* ¶¶ 38–43). Drawing all reasonable inferences in HUB's favor, as this court must in ruling on a motion to dismiss, these allegations at least demonstrate that further due diligence into the AEU Plan by HUB was inhibited by Satler and Stoughton's statements and the false sense of security they created. Furthermore, it is unclear based on the allegations in the complaint what more HUB "could have learned through the exercise of ordinary prudence." *Turubchuk*, 958 F.3d at 552. And to the extent the SD Defendants claim that HUB should have known better than to rely on Stoughton's statements because the SD Defendants had no actual knowledge of the AEU Plan's solvency, HUB's allegations indicate that Stoughton presented himself as having such knowledge at the meeting. As justifiable reliance considers what the plaintiff knew, the court cannot say that HUB has failed to adequately allege that its reliance on Stoughton's statements was justifiable.

4.    *Remaining Elements*

As for the remaining elements of negligent misrepresentation, it is clear from the face of the complaint that HUB sufficiently pleads facts showing that Stoughton made the alleged false statements with carelessness or negligence in ascertaining their truth, that he did so intending to induce HUB to act, and that HUB suffered damages as a result of its reliance on Stoughton's statements. (*See* dkt. 36 at 12–14 (summarizing allegations).) Because HUB has alleged facts

sufficient to establish all elements of its negligent misrepresentation claim, the SD Defendants'
motion to dismiss that claim is denied.

## C.     Fraudulent Misrepresentation

Finally, the SD Defendants argue that HUB has failed to adequately state its claim for
fraudulent misrepresentation. To make out a claim for fraudulent misrepresentation under Illinois
law, a plaintiff must establish five elements: "(1) a false statement of material fact (2) known or
believed to be false by the person making it, (3) an intent to induce the plaintiff to act, (4) action
by the plaintiff in justifiable reliance on the truth of the statement, and (5) damage to the plaintiff
resulting from such reliance." *Lewis* v. *Lead Indus. Ass'n*, 178 N.E.3d 1046, 1055–56 (Ill. 2020).
The SD Defendants contend that HUB's complaint fails to meet the requirements of the Rule
9(b) heightened pleading standard, improperly seeks to hold the SD Defendants liable for their
opinions about future acts, and lacks sufficient factual allegations to show that the SD
Defendants knew or should have known of the falsity of Stoughton's statements or that HUB
justifiably relied on those statements.

### 1.     Rule 9(b)

Turning first to the Rule 9(b) objection, the SD Defendants argue that HUB "fails to
plead the specific content of the alleged misrepresentation(s) … or how any such statements
were false" and that the complaint is an impermissible "shotgun" pleading in which "[t]he
alleged false statements are not attributed to individuals, but are generally attributed to a group of
defendants." (Dkt. 29 at 11–12.) As for the first of these arguments, the complaint includes a
great deal of detail and specificity regarding the content of the allegedly false statements. HUB
explicitly alleges that, at the March 9, 2017 meeting, Stoughton and Satler represented that: the
AEU Plan was on track to fund and pay all unpaid claims and future claims; the AEU Plan would

remain financially sound and timely pay claims; because the AEU Plan would timely pay claims, HUB should keep employer groups and their employees enrolled in the AEU Plan and refer additional employer groups to the AEU Plan; a schedule was in place to pay the unpaid claims; and an excess policy through Lloyd's of London would cover claims exposures. (Dkt. 27 ¶¶ 38–43, 64.) HUB further alleges that these claims were false because the AEU Plan was in fact insolvent at that time. (*Id.* ¶¶ 46–51.) As such, the complaint describes with specificity the "'who, what, when, where, and how' of the fraud." *Presser*, 836 F.3d at 776.

The court also disagrees that HUB has made an impermissible shotgun pleading. The SD Defendants are correct that "a complaint that attributes [allegedly fraudulent] misrepresentations to all defendants, lumped together for pleading purposes, generally is insufficient" to identify with particularity who made the misrepresentation under Rule 9(b). *Cornielsen* v. *Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 599 (7th Cir. 2019) (citation omitted). But the Seventh Circuit warns against taking "an overly rigid view" of the Rule 9(b) requirements because "the precise details that must be included in a complaint may vary on the facts of a given case." *Presser*, 836 F.3d at 776. The rule against lumping defendants together, therefore, is not a rule of rigid formalism but rather reflects the underlying principle that "[b]ecause fair notice is perhaps the most basic consideration of Rule 9(b), the plaintiff who pleads fraud must reasonably notify the defendants of their purported role in the scheme." *Vicom, Inc.* v. *Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777–78 (7th Cir. 1994) (cleaned up). Thus, the court asks whether the complaint "inform[s] each defendant of the nature of his alleged participation in the fraud." *Id.* at 778.

Here, there is no doubt that the complaint alleges that both Satler and Stoughton made all the alleged misrepresentations and does not distinguish between statements made by one or the other. (Dkt. 27 ¶¶ 38–43.) But pleading in such a manner is reasonable considering the alleged

factual circumstances and is sufficient to put the SD Defendants on notice of their alleged participation in the fraud. The SD Defendants inaccurately characterize the complaint as adding the SD Defendants "to the host of other Defendants alleged to have made vague representations as to 'solvency' and other promises of future performance to pay claims." (Dkt. 33 at 9.) But as discussed above, the complaint alleges no such "host" of other defendants. Instead, it describes a small meeting between representatives from HUB and two defendants: Stoughton and Satler. (Dkt. 27 ¶¶ 31–34.) As the interests of the SD Defendants were closely aligned with those of the AEU Defendants (*see id.* ¶¶ 25, 68, 78; dkt. 27-1 ¶ 27), it is not unreasonable to infer that Stoughton made comments supporting and reinforcing those made by Satler, or vice versa. Put differently, HUB seems to allege that Stoughton and Satler each communicated the same ideas at the meeting. Drawing all reasonable inferences in HUB's favor, the court understands the complaint to allege that *both* Stoughton and Satler made the *same* misrepresentations. This is readily distinguishable from cases in which a plaintiff makes general attributions of fraudulent conduct to multiple defendants because the plaintiff is unable to identify which particular defendants made particular misrepresentations or participated in particular fraudulent schemes. *See Cornielsen*, 916 F.3d at 599; *Vicom*, 20 F.3d at 778. The complaint reasonably notifies the SD Defendants of Stoughton's alleged fraudulent misrepresentations, and HUB's allegations that Satler made the same misrepresentations does not make such notice any less valid. HUB satisfied the requirements of Rule 9(b) in pleading its fraudulent misrepresentation claim.

2.      *Opinions About Future Acts*

        Next, the SD Defendants argue that HUB cannot hold them liable for making claims about future acts or expectations that later turned out to be false. It is true that Illinois law generally provides "no action for promissory fraud, meaning that the alleged misrepresentations

must be statements of present or preexisting facts, and not statements of future intent or conduct." *Abazari*, 40 N.E.3d at 270. But HUB does not allege only that the defendants promised to fully fund the AEU Plan and then failed to do so, but also that the AEU Plan was already insolvent on March 9, 2017 when Stoughton and Satler assured HUB of the AEU Plan's financial health. (*See* dkt. 27 ¶¶ 38–43, 48–50, 58; dkt. 27-1 ¶¶ 123–28.) HUB therefore alleges that Stoughton and Satler not only provided HUB with financial projections that failed to pan out, but also that they purposefully misrepresented the then-existing financial state of the AEU Plan. Misrepresentations as to the AEU Plan's then-existing solvency constitute "statements of present or preexisting facts" that may support an action for fraud. *Abazari*, 40 N.E.3d at 270; *see also Avon Hardware Co.* v. *Ace Hardware Corp.*, 998 N.E.2d 1281, 1288 (Ill. App. Ct. 2013).

Furthermore, even the alleged false promises as to future conduct are actionable in this case. The Illinois Supreme Court has recognized an exception to the general rule against promissory fraud: "such promises [to perform future conduct] are actionable if the false promise or representation of future conduct is alleged to be the scheme employed to accomplish the fraud." *HPI Health Care Servs., Inc.* v. *Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 682 (Ill. 1989); *accord Henderson Square Condo. Ass'n* v. *LAB Townhomes, LLC*, 46 N.E.3d 706, 714 n.2 (Ill. 2015). Here, HUB alleges that Stoughton and Satler made the alleged false promises out of "pecuniary interests"—specifically, obtaining new plan participants (dkt. 27 ¶ 41) and preventing HUB from alerting its employer group clients of the AEU Plan's inability to pay claims (which could have resulted in them leaving the plan) (dkt. 27 ¶¶ 68, 78). Thus, HUB alleges that Stoughton and Satler's false promises of future claims payments were the linchpin of their fraudulent scheme. Accordingly, the court concludes that HUB pleaded sufficient facts to make the alleged false promises actionable under the "fraudulent scheme" exception. *See Heartland*

*Women's Healthcare, Ltd.* v. *Simonton-Smith*, 2021 IL App (5th) 200135-U, 2021 WL 1251522, at *5–7 (Ill. App. Ct. April 2, 2021) (surveying and summarizing "fraudulent scheme" exception cases).

### 3.    *Knowledge and Justifiable Reliance Elements*

Finally, the SD Defendants argue that the complaint lacks sufficient factual allegations to show that they knew or should have known that Stoughton's alleged misrepresentations were false or that HUB justifiably relied on those statements. Because SD Trust only distributed AEU Plan funds at the direction of the AEU Defendants (*see* dkt. 27 ¶ 26), the SD Defendants contend that the complaint "contains no allegations that Mr. Stoughton or SD [Trust] had any basis of knowledge as to what future instructions they would be given regarding the distribution of funds controlled by AEU" (dkt. 29 at 13). But HUB has alleged that the SD Defendants were deeply involved in the financial operations of the AEU Plan and were aware that the AEU Plan had an unfunded claims problem in February 2017. (*See* dkt. 27-1 ¶¶ 77–81, 91–92, 128.) At the motion to dismiss stage, such allegations are sufficient to allow the reasonable inference that the SD Defendants knew or should have known that Stoughton's alleged statements regarding the AEU Plan's solvency were false.

As for justifiable reliance, the SD Defendants restate the argument they made in response to the corresponding element of HUB's negligent misrepresentation claim. As such, the court applies the same analysis as above and concludes that HUB has adequately alleged justifiable reliance on Stoughton's statements. The SD Defendants' Rule 12(b)(6) motion to dismiss this claim is denied.

## **CONCLUSION AND ORDER**

For the forgoing reasons, the SD Defendants' motion to dismiss is denied. The SD Defendants shall answer or otherwise plead to complaint by June 14, 2023.

Date: May 31, 2023

_____
U.S. District Judge Joan H. Lefkow